UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-60285-CR-ROSENBAUM

UNITED STATES OF AMERICA,

        Plaintiff,

v.

TERRANCE BROWN,
TORIANO JOHNSON,
DARYL DAVIS,
HASAM WILLIAMS, and
JOSEPH K. SIMMONS,

        Defendants.
_____/

**ORDER ON DEFENDANT'S MOTION TO
EXCLUDE EVIDENCE OF EXTRINSIC ACTS**

        This matter is before the Court on the Government's Motion *in Limine* Regarding the Government's Use of Evidence of 2001 to 2005 Robberies [D.E. 422] ("Government's Motion"). The Court has reviewed the Government's Motion, all supporting and opposing filings, and the record in this case, and has heard oral argument on the Motion, and is otherwise duly advised in the premises. After careful consideration, the Court now grants in part and denies in part the Government's Motion for the reasons set forth below.

### *I. Background*

        On October 1, 2010, a Brink's armored truck messenger was shot dead outside of a Bank of America branch located in Miramar when individuals attempted to rob him of approximately $395,000.00 that he was delivering. The Government has previously described the circumstances

of this crime in an application for Court Order for Disclosure of Historical Cell Site Records [D.E. 198], and the Court quotes portions of the Government's recitation that are relevant to resolution of the Government's pending 404(b) Motion:

    a.    On October 1, 2010, at approximately 11:55 a.m., a Brinks armored car messenger was delivering approximately $397,500.00 in United States currency to Bank of America, located at 7950 Miramar Parkway, Miramar, Florida, located in Broward County, in the Southern District of Florida. As the Brinks messenger attempted to enter the branch, two black males carrying firearms approached him. One individual was later identified as Nathaniel Moss. According to multiple eyewitnesses, Moss, wearing a bright orange traffic safety vest, held a firearm to the messenger's head. Moss then shot the messenger in the head, fatally wounding him. The second subject (Subject 2) grabbed a bag of money belonging to Brinks.

    b.    Moss and Subject 2 fled the scene. Surveillance video shows Subject 2 entering the front passenger side of a white Toyota Camry. The vehicle traveled south through a strip mall parking lot near the bank, coming to a stop after colliding with a trash dumpster. Upon police arrival, the vehicle had been abandoned. Moss was apprehended hiding in bushes a short distance from where the car had come to a stop. Later investigation revealed that the car had been reported stolen on or about September 17, 2010, from the Coconut Creek, Florida, area.

    c.    Near Moss, officers recovered a bright orange traffic safety vest. Moss was wearing a ballistic vest, and had in his possession a pair of pliers and a pair of latex gloves.

    d.    A civilian eyewitness positively identified Moss as the individual who shot the Brinks messenger.

    e.    An eyewitness saw two black males enter a vehicle near the area where Moss was subsequently found hiding. The eyewitness told law enforcement the first three digits of the license plate of that car. That car, which is a silver Honda Civic, was located a little more than a mile from the scene of

>the robbery. The car had been abandoned with the engine still running. Later investigation revealed that the car had also been reported stolen on or about September 28, 2010, from the Coconut Creek, Florida, area.

D.E. 198 at 10-13.

In connection with these events, Moss eventually pled guilty to conspiracy to commit Hobbs Act robbery, Hobbs Act robbery, and using and carrying a firearm during the commission of a Hobbs Act robbery and causing the murder of a person in the course of that violation. *See United States v. Nathaniel Moss*, Case No. 10-60264-CR-COHN (S.D. Fla. Jan. 13, 2012), D.E. 150 (Judgment). As a part of his plea agreement, Moss cooperated with the Government in its investigation of the October 1, 2010, robbery. Through Moss, the Government learned of other allegedly successful and unsuccessful armored car robbery attempts in which Moss and some Defendants allegedly participated over a number of years. To varying degrees, the Government obtained evidence tending to corroborate some of these prior robbery attempts and charged Defendants with the attempts that occurred between May 2010 and October 1, 2010.

Thus, in this case, Defendants Terrance Brown, Toriano Johnson, Daryl Davis, Hasam Williams, and Joseph K. Simmons are charged by indictment with conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a). In addition, Defendants face multiple counts of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a), and counts of using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A). The Second Superseding Indictment also asserts that Defendants used and carried a firearm during and in relation to a crime of violence, and, in the course of doing so, caused the death of a person through the use of a firearm, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(j)(1). All of these claims arise out

of activities that allegedly occurred from at least May 2010 through about October 1, 2010.

In anticipation of trial in this case, the Government filed its Notice of Intent to Rely on 404(b) Evidence Regarding Defendant[]s['] Acts [D.E. 70] ("Notice"). Through this Notice, the Government advises Defendants and the Court of its intention under Rule 404(b), Fed. R. Evid., to present evidence relating to (1) an armored car robbery that occurred in February 2005 and (2) a string of armored car robberies that happened from 2001 to February 2005. In the alternative, the Government suggests that this evidence is inextricably intertwined with the crimes charged in the pending Second Superseding Indictment.

In explaining the alleged relevance of the evidence that the Government seeks to admit, the Government states,

> Terrance Brown was a member of a robbery crew prior to his association with the present co-conspirators in the years leading up to his planning and participation in the February 2005 armored truck robbery. Crew members were friends or vouched for by other crew members. All crew members lived in South Florida. The crew accepted Brown on such a voucher. Crew members were responsible for bringing potential robbery jobs to the attention of the crew after surveillance and planning. The crew would then decide whether to commit the robbery. The person who brought the robbery to the attention of the crew received the lion's share of any proceeds. The person who supplied the stolen vehicles for use in the robberies and who acted as a getaway driver received the least.
>
> The original robbery crew consisted of Brown, Ishmael Paul, Robert Lamons, and Michael McCarthy. Brown's role in the original crew was, *reluctantly* limited to stealing cars for use in the robberies and acting as a getaway driver. Brown brought potential jobs to the attention of the crew, including doing a Brinks truck at the very Bank of America in Miramar that is the subject of Counts 3 and 5 of the Superseding Indictment. However, the original crew did not attempt this robbery. The crew continually used Brown to steal vehicles for use in the robberies and as a getaway driver. Brown became increasingly frustrated with his limited role and, consequently, his

limited take from the robbery proceeds.

In 2004, federal authorities arrested Brown and original robbery crew members for a robbery he committed with Lamons and McCarthy in South Carolina in 2003. Paul was previously murdered outside of a barber shop owned and operated by Brown. The Court in South Carolina held Lamons and McCarthy in pre-trial detention, but granted Brown a bond. While out on bond, Brown conspired with Johnson, his longtime friend, to constitute a new robbery crew. Brown brought in Maurice Mansfield, Bobby Madison and Daryl Davis; Johnson brought in Hasam Williams and Nathaniel Moss. Brown and Johnson planned, and the new crew committed, a robbery of a Brinks guard in February 2005. Lamons and McCarthy pled guilty. Brown proceeded to trial that resulted in a hung jury. Brown eventually pled guilty to a federal charge of Conspiracy to Transport Stolen Currency, though in the plea agreement he admitted to stealing cars for Lamons and McCarthy to use in an armored car robbery in South Carolina and knowingly driving away with them and the money back to South Florida.

The Court sentenced Brown to five years in prison. Lamons and McCarthy received sentences above 30 years in prison. Brown was released from prison and returned to South Florida in March 2010. The crew that Brown and Johnson put together for the February 2005 robbery had been dormant during the time of Brown's incarceration because Brown was the crew's leader and organizer.

In February 2005 and, again in 2010, Brown used the preparation, plan, common scheme, and *modus operandi* he learned from his association with Lamons, Paul and McCarthy. He relied on friends in 2005, and called upon them again in 2010, knowing their willingness to commit robberies in the manner that he dictated. As a result, the current conspirators agreed to rob armored truck guards using two gunmen and two separate, stolen getaway vehicles, a traffic safety vest and cosmetics (on occasion). When Williams could not act as a gunman for the September 17, 2010 robbery, he vouched for Simmons, who then joined the conspirators as "green hoodie." When Madison flubbed the September 17th robbery in his role as getaway driver, Johnson brought in and vouched for Jermaine Parrish.

D.E. 421 at 2-3 (emphasis in original).

The Government further suggests similarities between the crimes charged in the pending

Second Superseding Indictment and the earlier robberies of which it seeks to admit evidence:

**October 2, 2001: Brinks Truck at First Union Bank**

Southern District of Florida

In or around September 2001, Ishmail Paul . . . , Mike McCarthy . . . , Robert Lamons . . . and Brown conspired to rob a Brinks truck located at the First Union Bank in North Miami. In preparation for the robbery, Brown stole two vehicles and supplied them to Paul, McCarthy and Lamons to be used for the robbery. Paul and McCarthy decided to be the gunmen. Brown suggested that Paul wear an orange traffic safety vest during the commission of the crime in order to blend in with the people gathered at the bank[, and Paul wore an orange traffic safety vest during the commission of the crime]. Lamons planned to be the getaway driver.

On October 2, 20[0]1, Lamons drove Paul and McCarthy to the bank in one of the stolen vehicles provided by Brown. After Paul and McCarthy robbed the Brink guard at gunpoint as planned, Lamons drove the getaway vehicle to the second stolen vehicle which was parked nearby. After exiting the getaway vehicle, the men torched the vehicle before fleeing in the second vehicle. As a result of the robbery, the crew successfully stole approximately $585,000. Paul, McCarthy and Lamons gave Brown approximately $6,000 for supplying them with the stolen vehicles.

**June 12, 2002: Brinks Truck at Washington Mutual Bank**

Southern District of Florida

In or around June 2002, Brown, Paul, McCarthy and Lamons again conspired to rob a Brinks truck located at Washington Mutual Bank in North Miami. Paul and McCarthy were the gunmen. Brown was getaway driver. Lamons was a lookout in a separate vehicle. The crew successfully stole approximately $200,000.

**November 20, 2002: Brinks Truck at Sky Lake Mall**

Southern District of Florida

In November 2002, Brown, Paul, Lamons and McCarthy conspired to rob a Brinks truck at the Sky Lake Mall in Miami. Prior to the

robbery, Paul cased the bank and determined that it would be an easy target to rob. McCarthy and Lamons agreed to be the gunmen. Paul supplied them with clothes, a bullet proof vest and a gun. Brown provided stolen vehicles to be used and was also the getaway driver. During the robbery, the victim was grazed with a bullet that was accidentally discharged during a struggle. The crew stole approximately $200,000. Each crew member received approximately $40,000 to $50,000 for their roles in the crime.

**April 8, 2003: AT Armored Truck at Wachovia Bank**

District of South Carolina

Beginning in or around late March 2003, Brown, Paul, McCarthy a[n]d Lamons conspired to rob an AT Sy[s]tems armored truck outside a Washington Mutual Bank in Anderson, South Carolina. Paul videotaped the armored truck and the bank prior to the robbery. Brown rented a Chevy van and stole two vehicles, a burgundy Toyota Camry and a Chevy Suburban SUV, to be used in the heist. Paul and McCarthy agreed to be the gunmen.

On the day of the robbery, Brown drove Paul and Lamons to the scene in the Toyota Camry. Paul and McCarthy wore[]bullet proof vests and disguised themselves with cosmetics. Lamons drove the rented van and was the lookout. During the robbery, Brown drove Paul and McCarthy to the Chevy Suburban which was parked a few blocks away. They abandoned the Toyota Camry and fled the area in the Chevy Suburban. The crew members later divided up the cash among them and burned the checks.

*Id.* at 7-9. To prove these robberies, the Government states that it intends to introduce Brown's plea agreement in his South Carolina case, which , the Government contends, contains a factual proffer of "some of the events set forth above." *Id.* at 17. In addition, the Government announces its intention to call Robert Lamons to testify regarding the 2001 to 2005 robberies in which he allegedly participated with Brown. *Id.*

As for the February 2005, robbery, which allegedly involved Brown and Johnson in the planning and Brown, Madison, Davis, Williams, and Moss in the execution, the Government

describes the incident and proof of it as follows:

> The United States will . . . introduc[e] the testimony of a witness who saw two people in traffic safety vests approach the armored car guard and who saw one hold him at gunpoint while the second took the money. The government will also call a witness who saw these individuals flee into a waiting vehicle driven by a third person, who then drove them from the scene of the crime. The government will then call a witness who saw these individuals abandon that vehicle and make their escape in a second vehicle. Likewise, the government will call witnesses to establish that the recovered vehicles were stolen and from where. The government will also call a custodian of records to establish the amount of money taken int hat robbery. Finally, in order to prove this crime and the defendants' participation in it, the government will call Nathaniel Moss, one of the coconspirators who committed the 2005 and 2010 crimes with the defendant.

*Id.* at 16. According to the Government, Johnson was involved in the planning stage only and did not actually participate in the robbery because he was incarcerated at the time.

The Government argues that the evidence of the 2001 to 2005 robberies is admissible as inextricably intertwined with the pending charges because it "explains the relationship between the coconspirators, including a testifying coconspirator. It also explains their roles in the pending conspiracy." D.E. 421 at 4. Additionally, the Government asserts that, independent of its allegedly inextricably intertwined nature, the evidence of the earlier robberies is admissible under Rule 404(b), Fed. R. Evid., as evidence of intent, preparation, plan, and identity.

Defendants oppose the introduction of the 2001 to 2005 robberies on various bases. With the exception of Brown, all Defendants point out that they were not even arguably involved in the robberies that occurred between 2001 and 2003. And Simmons notes that he did not participate in any of the prior robberies (although during the hearing, counsel for Simmons suggested that this fact might actually be helpful to his client). For these reasons, these Defendants contend that evidence

of the earlier robberies is not relevant to the charges against them. For his part, Brown challenges the Government's evidence establishing his involvement in the 2001 to 2003 robberies and further posits the irrelevancy of these robberies to the pending matter, in view of the fact that, except for Brown, they involved different participants.

As for the 2005 robbery, Defendants who allegedly participated assert that the Government cannot adequately prove their involvement in the crime, and, even if it could, any probative value of the evidence is substantially outweighed by unfair prejudice. Johnson further objects to any evidence that would disclose the fact that Johnson was incarcerated at the time of the 2005 robbery. And Brown suggests that the strength of the Government's case against Defendants may obviate the purported need for the Government to present the evidence of the earlier robberies.

## *II. Discussion*

Rule 404(b) usually governs the admission of evidence of prior bad acts. *United States v. Richardson*, 764 F.2d 1514, 1521 (11th Cir. 1985). Under Rule 404(b), Fed. R. Evid., "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." The rule further provides, however, that such evidence may be admitted for another purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." As the Eleventh Circuit has described Rule 404(b), it is one "of inclusion[;] . . . accordingly, '404(b) evidence, like other relevant evidence, should not lightly be excluded when it is central to the prosecution's case.'" *United States v. Jernigan*, 341 F.3d 1273, 1280 (11th Cir. 2003) (citation omitted).

Nevertheless, not all evidence of past crimes and wrongs is governed by Rule 404(b).

*Richardson*, 764 F.2d at 1521.  The Eleventh Circuit has explained, "Evidence of criminal activity other than the offense charged is not extrinsic [and therefore not excludable under Rule 404(b),] provided that the evidence is '(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense.'" *United States v. Ellisor*, 522 F.3d 1255, 1269 (11th Cir. 2008) (citing *United States v. Jiminez*, 224 F.3d 1243, 1249 (11th Cir. 2000) (citation omitted); *United States v. Williford*, 764 F.2d 1493, 1499 (11th Cir. 1985) ("Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.")).  Evidence that is inextricably intertwined "tends to corroborate, explain, or provide necessary context for evidence regarding the charged offense." *United States v. Gay*, 423 F. App'x 873, 876 (citing *Jiminez*, 224 F.3d at 1249).

      For example, in *United States v. Simpkins*, 240 F. App'x 334 (11th Cir. 2007), the defendant and three others were charged with, among other crimes, conspiracy to commit armed bank robbery and bank robbery.  During the trial, the Government presented the testimony of a cooperating codefendant that the defendant was the driver in the charged robbery because he had been a gunman in a prior, uncharged robbery but did not believe that he had been paid enough to warrant the danger associated with serving as a gunman in the charged robbery.  The Eleventh Circuit affirmed the district court's admission of the evidence on the basis that the evidence was inextricably intertwined with the charged conduct.  As the court explained, "Here, [the cooperating codefendant's] testimony about the prior robbery explained why [the defendant] was asked to participate in the charged

robbery and why he was the driver of the getaway car." 240 F. App'x at 340.

Similarly, in *Richardson*, where the uncharged conduct apparently did not occur as close in time to the charged conduct, the government introduced the testimony of one of the defendant's co-conspirators, who stated that he and the defendant had purchased and distributed cocaine together several times before the conduct charged in the indictment. The Eleventh Circuit upheld the admission of the evidence, finding that the evidence fell outside the scope of Rule 404's prohibitions because it was inextricably intertwined with the evidence of the charged crime. 764 F.2d at 1521. As the court explained, the challenged evidence "formed an 'integral and natural part of the witness's accounts of the circumstances surrounding the offenses for which the defendant was indicted.'" *Id.* (citation omitted). More specifically, the court concluded that the evidence "explain[ed] why [the cooperating co-conspirator] had turned to [the defendant] rather than some other person to obtain the cocaine." *Id.*[1]

---

[1]*See also United States v. Costa*, 691 F.2d 1358, 1361 (11th Cir. 1982) (a cooperating witness's testimony that he had dealt in cocaine with the defendant before the conduct charged in the indictment was inextricably intertwined with the crime charged in the indictment where it explained why the cooperating witness believed that the defendant could provide him with a kilogram of cocaine); *United States v. Lopez*, 649 F.3d 1222, 1247-48 (11th Cir. 2011) (testimony of the defendant's cocaine customers regarding their dealings with the defendant before the period charged in the indictment was inextricably intertwined with the charged crime because it showed the defendant's relationship with the customer when the conspiracy began and how the customer and the defendant came to be trading together in large amounts of cocaine during the course of the conspiracy, thereby providing context); *United States v. Jubiel*, 377 F. App'x 925, 930-31 (11th Cir. 2010) (evidence that co-conspirators had committed similar robberies in the past was inextricably intertwined with the charged violations where detective testified that this information played a "key part" in how his investigation unfolded); *United States v. Garcia-Barzaga*, 361 F. App'x 109, 114-15 (11th Cir. 2010) (cooperating defendants' testimony that they had participated in robberies with the defendants before the conduct charged in the indictment occurred was inextricably intertwined with the violations set forth in the indictment because it "provided an explanation for why these particular defendants joined together and agreed to rely on each other to commit an armed narcotics robbery" and explained details such as why one conspirator offered to share his proceeds with another, how certain

Here, the Government asserts that the prior robberies are inextricably intertwined because they "explain the relationship between the coconspirators, the trust between them. [They are] necessary to complete the story of the conspiracy and the other offenses in the superseding indictment. . . . As in *Simpkins*, the 2005 crime explains the relationships of the coconspirators and their respective roles in the conspiracy." D.E. 421 at 19-21.

The Court agrees that the 2005 robbery explains why all Defendants except Simmons allegedly participated in the charged attempted robberies and robbery. In this regard, taking the evidence and allegations in the Second Superseding Indictment as true only for purposes of analyzing this issue, the evidence shows that all Defendants but Simmons previously worked together on a robbery crew that successfully robbed another armored truck in the same way that the charged attempted robberies and robbery were to occur or occurred. As a result of the 2005 robbery, all Defendants but Simmons knew each other, developed a certain level of trust with each other, and had reason to believe that they would again be successful in robbing an armored truck in the same way that they had done so in 2005. Moreover, the fact that Brown was in jail from 2005 through 2010 explains the five-year break in robberies. Thus, the 2005 robbery constitutes evidence that is inextricably intertwined with the charged crimes.

As for the 2001 to 2003 robberies, these crimes are inextricably intertwined with the crimes as charged against Brown only. Again assuming the truth of the evidence of the prior robberies and the crimes charged in the Second Superseding Indictment for purposes of this analysis only, Brown's participation in the 2001 to 2003 robberies explains (1) why Brown allegedly organized the charged

---

individuals could identify a co-conspirator's gun, and why the defendants had police paraphernalia in their vehicle at the time of their arrest).

attempted robberies and robbery; (2) why Brown used the particular *modus operandi* that he did in the charged crimes; (3) why he had to find new members of the crew; and (4) why the October 1, 2010, robbery occurred where it did. First, according to the Government's summary of the evidence of the prior robberies, Brown ran his own robberies in 2005 and during the period charged in the Second Superseding Indictment because he was not satisfied with the relatively small amount of payment he received when his role was limited to stealing cars and acting as a getaway driver. Second, Brown had learned from the earlier robberies that crew members were friends or people for whom other trusted crew members vouched, and he had learned the *modus operandi* used during the charged crimes from the 2001 to 2005 robberies. Third, Brown had to round up a new crew because the members of his old crew were either in jail or dead. And fourth, the October 1, 2010, robbery happened at the Miramar branch of Bank of America because Brown had previously scouted that location, but the other members of the 2001 to 2003 robbery crew had declined Brown's suggestion. For these reasons, the evidence of the 2001 to 2003 robberies is inextricably intertwined with the crimes set forth in the Second Superseding Indictment as they pertain to Brown.[2]

Although all of the robberies qualify as inextricably intertwined evidence, they are not automatically admissible. Rather, the Court must conduct an analysis under Rule 403, Fed. R. Evid., to determine whether the evidence should, nonetheless, be excluded. Under Rule 403, the court has the discretion to exclude relevant evidence "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time,

---

[2] For many of these same reasons, even if the evidence were not inextricably intertwined with the charged conduct, provided that the Government could prove the conduct by a preponderance of the evidence, the evidence would still be admissible, as set forth in this Order, under Rule 404(b), Fed. R. Evid. At the very least, the evidence is admissible to establish plan, identity, preparation, and motive.

or needlessly presenting cumulative evidence." The Eleventh Circuit has described Rule 403 as "an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility." *United States v. Lopez*, 649 F.3d 1222, 1247 (11th Cir. 2011) (citation and internal quotation marks omitted). As the Eleventh Circuit has explained, when evaluating an objection under Rule 403, the court must "look at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *Id.* (citation and internal quotation marks omitted).

In applying these standards in the pending matter, the Court concludes that, for the most part, the evidence should not be excluded under Rule 403. With regard to the 2005 robbery, that event is highly probative. Not only does it explain the Defendants' alleged involvement in the 2010 crimes, but the same *modus operandi* was used in both robberies, including the use of two stolen cars and orange safety vests. In addition, the Government has indicated that it intends to present the testimony of Moss, as well as other evidence, including the armored car guard who was shot during the 2005 robbery. If a jury chose to believe this evidence, it could find that Defendants committed the 2005 robbery.

As for the 2001 to 2003 robberies, the Court concludes that the October 2, 2001, robbery, which involved the use of orange safety vests and two stolen cars, and the April 8, 2003, robbery, which resulted in the break-up of the original crew, should be admitted because they are highly probative, and their probative value is not substantially outweighed under Rule 403. Moreover, the Government has indicated that it will prove these robberies through the testimony of Lamons, who,

if the jury chose to believe, could find that Brown participated in the 2001 and 2003 robberies.[3]

But the June 12, 2002, and November 20, 2002, robberies should be excluded as needlessly cumulative. These robberies do not contribute anything more than the 2001 and 2003 robberies to an understanding of Brown's alleged involvement in the charged crimes. Nor does the Government's description of the 2002 robberies reveal the same types of detailed similarities to the charged crimes as the 2001 and 2003 robberies. Under these circumstances, the Court finds that evidence of the 2002 robberies should be excluded under Rule 403 because their probative value is substantially outweighed by their needlessly cumulative effect.[4]

Finally, at this time, the Court declines to consider *sua sponte* whether any severances of any Defendants should be granted, in view of the Court's rulings on the admissibility of the 2001 to 2005

---

[3]In addition, the Government has stated that it anticipates introducing evidence of Brown's guilty plea on charges of transporting stolen currency. The Government asserts that the factual proffer supporting the guilty plea referred to Brown's involvement in the robberies. Brown retorts that his guilty plea in the 2005 case is now on appeal, and, therefore, the Government should not be permitted to rely upon it to prove the earlier crimes. Regardless of whether the 2005 guilty plea is admissible, however, if a jury believed Lamons, it could find by a preponderance of the evidence that Brown committed the 2001 and 2003 robberies. To the extent that Brown intends to seek to exclude evidence of his 2005 guilty plea from the trial, he may wish to file a separate motion *in limine* briefing the issue.

[4]To the extent that the Government's brief may suggest that, in addition to satisfying the requirements discussed above, the Government must prove by a preponderance of the evidence that the uncharged, inextricably intertwined crimes occurred in order for them to be admissible, this Court disagrees that an independent requirement exists. The two cases cited by the Government in its discussion of *extrinsic* evidence (which, the inextricably intertwined evidence is not) within the section of its brief devoted to inextricably intertwined evidence set forth the requirement that the Government prove extrinsic acts by a preponderance of the evidence. While the Court agrees that the Government must make a showing that a jury could find, by a preponderance of the evidence, that the defendant committed an extrinsic act that the Government seeks to introduce, that standard does not apply to intrinsic evidence, such as that that is inextricably intertwined with the charged conduct. Instead, the weight of the evidence tending to show that a defendant engaged in uncharged, inextricably intertwined conduct is relevant to the Rule 403 inquiry.

evidence. Counsel for both Simmons and Johnson seemed to suggest at argument that they did not necessarily object to the admissibility of the 2001 to 2005 crimes. Instead, Johnson requested only to exclude reference to the fact that he was in jail during the 2005 robbery. The Court sees no reason why this evidence needs to be admitted to explain Johnson's alleged involvement in the robber. Instead, the Government may describe Johnson as being unavailable to execute the 2005 robbery. As for Davis and Williams, these Defendants' desires with regard to severances are unknown.

### *III.  Conclusion*

For the foregoing reasons, the Government's Motion *in Limine* Regarding the Government's Use of Evidence of 2001 to 2005 Robberies [D.E. 422] is **GRANTED IN PART and DENIED IN PART**, consistent with the terms of this Order.

**DONE and ORDERED** at Fort Lauderdale, Florida, this 21st day of March 2013.

_____
ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

copies:

Counsel of Record