UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-60285-ROSENBAUM/SNOW

UNITED STATES OF AMERICA,

        Plaintiff,

v.

TERRANCE BROWN, *et al.*,

        Defendants.
_____/

## ORDER

This matter is before the Court on Defendant Terrance Brown's Motion to Exclude the Testimony of Nathanial Moss [D.E. 520]. The Court has carefully reviewed Defendant's Motion and all supporting and opposing filings and is otherwise duly advised in the premises. For the reasons set forth below, the Court now denies Defendant Moss's Motion.

### *I. Background*

On October 1, 2010, a Brink's armored truck messenger was shot dead outside of a Bank of America branch located in Miramar when individuals attempted to rob him of approximately $395,000.00 that he was delivering. In connection with this event, Nathanial Moss was charged with conspiracy to commit Hobbs Act robbery, Hobbs Act robbery, and using and carrying a firearm during the commission of a Hobbs Act robbery and causing the murder of a person in the course of that violation. *See United States v. Nathaniel Moss*, Case No. 10-60264-CR-COHN (S.D. Fla. Jan. 13, 2012), D.E. 9 (Indictment). Based on these charges, Moss was eligible for the death penalty. *See id.* at 3-4.

In exchange for the Government's agreement not to seek the death penalty, however, Moss pled guilty to the Indictment on October 14, 2011.[1] *See* Case No. 10-60264, D.E. 145 at ¶¶ 1, 11; D.E. 143. Ultimately, Moss was sentenced to life imprisonment. *See id.* at D.E. 150. As a part of his plea agreement and in effort to obtain a reduced sentence, Moss agreed to cooperate with the Government in its investigation of the October 1, 2010, robbery. *See id.* at D.E. 145, ¶¶ 8-10. Through Moss, the Government learned of other allegedly successful and unsuccessful armored-car robbery attempts in which Moss, Defendant Brown, and other Defendants allegedly participated over a number of years. To varying degrees, the Government obtained evidence tending to corroborate some of these prior robbery attempts and charged Defendants with the attempts that occurred between May 2010 and October 1, 2010.

In part as a result of Moss's cooperation, the grand jury returned charges against Defendants Terrance Brown, Toriano Johnson, Daryl Davis, Hasam Williams, Joseph K. Simmons, and Bobby Ricky Madison, relating to the October 1, 2010, armored-car robbery and some of the other alleged attempted armored-car robberies about which Moss told the Government during his debriefing

---

[1] Brown suggests that Moss may still be subject to the death penalty via a State of Florida prosecution, if Moss breached his federal plea agreement. *See* D.E. 520 at 3 n.2, 7 n.5. This theory is not realistic. During Moss's plea colloquy, his attorney explained that although the State Attorney's Office made no promises about whether it intended to proceed with prosecuting Moss in state court, it nonetheless provided a letter stating that whatever sentence the federal Court imposed, the state-court sentence would be the same and would run concurrent and be coterminous. Case No. 10-60624, D.E. 152 at 11:20 - 13:6. In view of the fact that the Government has already taken the death penalty off the table and that there is no basis whatsoever for believing that the Government desires to or would be able to change its position in that regard under the known circumstances, under the letter agreement described by Moss's counsel, Florida could not seek the death penalty.

sessions. Defendant Madison's trial proceeded separately from the other Defendants.[2]

During Madison's trial, the Government called Moss to testify. During his testimony, Moss implicated Defendants Brown, Johnson, Davis, Williams, and Madison by name, and Defendant Simmons by description. In explaining to the jury how Moss came to testify regarding the robberies, the following exchange occurred:

> Q: Did there come a time when you decided to change your not guilty plea when you were arrested to guilty?
>
> A: Yes, Sir.
>
> Q: And why did you decide to plead guilty?
>
> A: Because, to be honest, they was seeking — the Government was seeking the death penalty for my life and they offered me life instead of death and I took it.
>
> Q: Okay. Did you plead guilty because you were guilty?
>
> A: Yes, I was guilty.
>
> Q: But why did it take — it took about a year, would you agree, from the time you were arrested — well, you were arrested in October of 2010 —
>
> A: Yes.
>
> Q: — right, and you eventually changed your plea to a guilty plea in October; is that right?
>
> A: Yes.
>
> Q: The next year. So it took a year. Why did it take a year?

---

[2] Defendant Madison allegedly was not involved in the October 1, 2010, robbery that resulting in the death of the Brink's messenger. As a result, he was not death-penalty eligible like the other Defendants in this case. A few months after the conclusion of Madison's trial, the Government announced that it would not seek the death penalty for the other Defendants in this case. Their trial is currently set to begin on May 20, 2013.

A: Well, I was going through it mentally, physically, emotionally and spiritually. You know, I couldn't decide at the time what was the right thing to do, you know, without the proper spiritual guidance that I needed. I know I committed a crime and I was guilty and I deserved to be punished for what I have done, but the thing is, is how was I going to own up to this big, major responsibility. So, eventually, I did own up to it with some spiritual guidance.

Q: And actually, before your change of plea a year later, you had met with the Government attorneys and the FBI and your lawyers?

A: Yes.

Q: To kind of tell them what happened?

A: Yes.

* * * * *

Q: But the first time, do you remember it?

A: I really can't put my finger on it.

Q: Okay. Was it before you changed your guilty plea?

A: Yes.

* * * * *

Q: And the death penalty was still pending at that time; is that right?

A: Yes, it was.

* * * * *

Q: Do you remember how you were identifying people who were the coconspirators? Were you giving us names at that time?

A: Yes. Giving you — at that time, I was giving the names, but at the same time, I was just saying phone one, phone two, phone three, phone four had this.

Q: So, would it be fair to say that when you were talking with us

>you would refer to people by telephone one, telephone two?
>
>A:   Telephone three, telephone four, five.
>
>Q:   And at the end of that debriefing, you were shown some photographs and you were able to then say, I guess you know who telephone one is, I guess you know who telephone two is; is that accurate?
>
>A:   Yes.

D.E. 392 at 163:19 - 166:14.

Upon reviewing Moss's testimony during Madison's trial, Brown filed the pending Motion seeking to exclude Moss from testifying at Brown's trial. In his Motion, Brown asserts that "it was only under the threat of a death sentence that Moss implicated Mr. Brown and his alleged coconspirators." D.E. 520 at 3. Thus, Brown reasons, allowing Moss to testify would violate Brown's due-process rights. *See id.* at 3-7. The Government disagrees, arguing that Moss's testimony was not coerced, but that, even if it had been, to exclude testimony, a defendant must show not only that it was coerced, but also that it was false — something that Brown does not attempt to do in his Motion. *See* D.E. 559.

## *II. Discussion*

Brown contends that Moss's statements were so coerced that their introduction against Brown would violated Brown's due-process rights. He does not attempt to demonstrate the falsity of the statements but rather relies exclusively on the allegedly coerced nature of the statements to seek to exclude them.

The Government responds by insisting that third-party statements may be excluded only where they are not only coerced but also false and the Government knew them to be false when it

presented them. *See* D.E. 559 at 2-3 (citing *Hysler v. Florida*, 315 U.S. 411 (1942)). While it is true that *Hysler* considered these three factors, the reason for that stemmed from the manner in which the petitioner raised his claim. More specifically, in *Hysler*, the petitioner complained that the testimony of the two witnesses who had implicated him was perjured and that the witnesses testified against him falsely because they had been coerced. *See Hysler*, 315 U.S. at 412. As a result of the way that the petitioner presented his issue, the Court evaluated all three factors. But nothing in *Hysler* purports to require that all three factors be considered whenever a defendant raises a claim that a witness's testimony has been coerced to the point where it violates the defendant's rights. *See, generally, Hysler*, 315 U.S. 411; *see also Nasrichampang v. Woodford*, 2006 WL 3932924, *7 (S.D. Cal. Mar. 3, 2006) (after discussing *Hysler*, noting that the petitioner "acknowledge[d] that '[t]he Supreme Court has never directly addressed the constitutional parameters of admitting a co-defendant's coerced statement or testimony'").

On the contrary, since *Hysler*, several courts have recognized that coerced third-party statements, in and of themselves, may violate due process where they result in a fundamentally unfair trial. *Wilcox v. Ford*, 813 F.2d 1140, 1148-49 (11th Cir. 1987) (citing *United States v. Merkt*, 764 F.2d 266, 274 (5th Cir. 1985); *United States v. Chiavola*, 744 F.2d 1271, 1273 (7th Cir. 1984); *United States ex rel Cunningham v. DeRobertis*, 719 F.2d 892, 895-96 (7th Cir. 1983); *United States v. Fredericks*, 586 F.2d 470, 480 (5th Cir. 1978), *cert. denied*, 440 U.S. 962 (1979); *La France v. Bohlinger*, 499 F.2d 29, 34 (1st Cir.), *cert. denied*, 419 U.S. 1080 (1974)); *see also Brown v. Jones*, 255 F.3d 1271, 1281-82 (11th Cir. 2001); *Williams v. Woodford*, 384 F.3d 567, 593 (9th Cir. 2002). Where an alleged due-process violation like the introduction of a coerced statement occurs that does not involve the denial of a defendant's specific constitutional right (such as the right to counsel or

the right to remain silent), the relevant inquiry is whether the admission of the challenged evidence would "so infect[] the trial with unfairness as to make [any] resulting conviction a denial of due process." *See Romano v. Oklahoma*, 512 U.S. 1, 12 (1994) (citation and internal quotation marks omitted).

Important considerations in determining whether the introduction of an allegedly coerced witness's statement violates a defendant's due-process rights include the following: (1) whether and to what extent the statement that is sought to be admitted was coerced, *see, e.g., Brown*, 255 F.3d at 1281-82; (2) whether an opportunity for cross-examination of the allegedly coerced statement will exist, *Wilcox*, 813 F.2d at 1149; (3) whether the defendant will have a chance to seek admission of contradictory evidence, *id.*; and (4) whether the jury instructions adequately account for the issue, *id.* Here, in their totality, these factors require the admissibility of Moss's statements.

With respect to the voluntariness of Moss's statements, the Court first agrees with Brown and disagrees with the Government that Moss's testimony during Madison's trial indicates that his plea agreement was, at least in part, contingent upon his cooperation with the Government, not just his willingness to plead guilty to the Indictment. In this regard, Moss testified that when he debriefed with the Government, the "death penalty was still pending." D.E. 392 at 165:23 - 166:1. But it does not necessarily follow that Moss's statements to the Government during his debriefing or his testimony at trial were therefore coerced to the extent that their admission against Brown would violate Brown's due-process rights.

First, it has long been established that a guilty plea is not coerced merely because a defendant pleads guilty to avoid the possibility of losing at trial and having the death penalty imposed. *See Brady v. United States*, 397 U.S. 742 (1970). Second, the circumstances of Moss's guilty plea show

that Moss voluntarily and intelligently pled guilty. He was represented by very competent counsel throughout the proceedings, and he reflected on pleading guilty for a year before he chose to actually enter his guilty plea. Nor is there any indication that Moss was physically or mentally threatened or tortured in any way.

These circumstances are substantially less coercive than those surrounding third-party-witness statements that the Eleventh Circuit has previously found to be insufficient to warrant the exclusion of such statements. For example, in *Wilcox*, the defendant was convicted of murder and concealment of the body after, among other evidence, witnesses Wrentz and Marshall testified. As the Eleventh Circuit described it,

> Wrentz was a very old, illiterate black man with what one police officer described as the "old slave syndrome." The police officer testified that he discovered that Wrentz would agree to anything a white man asked him in a leading question format. The transcripts reflect that the interrogating officers threatened to charge Wrentz with murder, threatened to lynch him, put words in his mouth, and told him he was headed for eternal damnation.
>
> Marshall received similar treatment. He was in his late sixties at the time of the interrogation and illiterate. Marshall was interrogated for eight and a half hours without being provided with food or water. The officers then threatened to send him to the electric chair . . . and also told him that he would die in prison.

813 F.2d at 1147. The *Wilcox* defendant argued that the police interrogations of Wrentz and Marshall "shock[ed] the universal sense of justice" and violated the defendant's due-process rights. *Id.* at 1147-48. In rejecting the defendant's claim, the Eleventh Circuit explained,

> The police misconduct here, while not commendable, . . . is not so extreme that it violates a sense of "fundamental fairness, shocking to the universal justice" as far as [the defendant's] constitutional rights are concerned. Nor do we find that this case presents "the rarest and most egregious circumstances" which might justify finding that [the

>    defendant's] due process rights were violated under [*United States v.*]
>    *Russell*[, 411 U.S. 423 (1973)].

813 F.2d at 1148.

If the despicable tactics employed in *Wilcox* were not sufficient to render the use of Marshall's out-of-court statements and Wrentz's and Marshall's in-court testimony coerced, the circumstances under which Moss made his statements regarding Brown and the other Defendants cannot render the statements violative of Defendants' rights if used against them. Whereas Moss faced the possibility of the death penalty as the result of charges returned by a grand jury, Wrentz and Marshall were threatened with death by the interrogating police officers who extracted their statements. And, while Moss had the advice and counsel of competent counsel when he made his statements months after his arrest and after reflecting spiritually on what he was doing, Wrentz and Marshall were psychologically and physically threatened and abused outside the presence of counsel to obtain their immediate statements. The circumstances present in the instance case do not approach the impropriety ruled insufficient to exclude the statements in *Wilcox*. As a result, they do not cross the high threshold that the Eleventh Circuit has established for demonstrating a due-process violation resulting from the presentation of an allegedly coerced statement from a witness.

Moreover, even if Moss's original statements to the Government did satisfy this standard — which, they do not — it is important to distinguish between the statements that Moss made to the Government during the course of the investigation and the statements that Moss is expected to make during trial, based on his testimony at Madison's trial. Two-and-one-half years have passed since Moss was arrested. Since that time, he has pled guilty and testified at Madison's trial. Even had coercion occurred during Moss's original statements to the Government, the passage of time

dissipates a previously existing coercive atmosphere. *See Williams v. Woodford*, 384 F.3d 567, 595 (9th Cir. 2004). Therefore, Moss would still be able to testify at Defendants' trial.

As for the other three factors, the Government will present Moss's statements through Moss's live testimony at trial. As a result, Brown (as well as the other Defendants) will be able to cross-examine Moss. Similarly, since the trial has not yet occurred and Brown knows in advance that the Government intends to present the testimony of Moss, Brown can prepare to seek admission of contradictory evidence, to the extent that such evidence may exist. Indeed, Brown's recent Motion to Compel *Brady/Kyles* Information [D.E. 479] demonstrates that Brown is doing just that. Finally, with regard to the jury instructions, the Court anticipates reading Eleventh Circuit Pattern Special Jury Instruction 1.2, Testimony of Accomplice or Codefendant with Plea Agreement, which addresses the issue of receiving a lighter sentence in exchange for cooperation with the Government, including testifying at trial. Should Brown feel it appropriate, he may also submit additional proposed instructions to deal with Moss's testimony.

### *III. Conclusion*

Because, for the foregoing reasons, Moss's statements and testimony do not violate Brown's due-process rights, Defendant Terrance Brown's Motion to Exclude the Testimony of Nathanial Moss [D.E. 520] must be **DENIED**.

**DONE AND ORDERED** at Fort Lauderdale, Florida, this 13th day of April 2013.

_____
ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

copies:

The Honorable Lurana S. Snow

Counsel of Record