UNITED STATES OF AMERICA,

               Plaintiff,

v.

TERRANCE BROWN, *et al.*,

               Defendants.

_____/

## ORDER

      This matter is before the Court on Defendant Terrance Brown's Motion for New Trial [ECF No. 1057].  The Court has carefully reviewed Defendant's Motion and all supporting and opposing filings and is otherwise duly advised in the premises.  For the reasons set forth below, the Court now denies Defendant Brown's Motion.

### *I.  Background*

#### *A.  Nathanial Moss*

      On October 1, 2010, a Brink's armored truck messenger was shot dead outside of a Bank of America branch located in Miramar when individuals attempted to rob him of approximately $395,000.00 that he was delivering.   In connection with this event, Nathanial Moss was charged with conspiracy to commit Hobbs Act robbery, Hobbs Act robbery, and using and carrying a firearm during the commission of a Hobbs Act robbery and causing the murder of a person in the course of that violation.  *See United States v. Nathaniel Moss*, Case No. 10-60264-CR-COHN (S.D. Fla. Jan. 13, 2012), ECF No. 9 (Indictment).  Based on these charges, Moss was eligible for the death penalty.

*See id.* at 3-4.

In exchange for the Government's agreement not to seek the death penalty, however, Moss pled guilty to the Indictment. *See* Case No. 10-60264, ECF No. 145 at ¶¶ 1, 11. Ultimately, Moss was sentenced to life imprisonment. *See id.* at ECF No. 150. As a part of his plea agreement and in effort to obtain a reduced sentence, Moss agreed to cooperate with the Government in its investigation of the October 1, 2010, robbery. *See id.* at ECF No. 145, ¶¶ 8-10. Through Moss, the Government learned of other allegedly successful and unsuccessful armored car robbery attempts in which Moss, Defendant Brown, and other Defendants allegedly participated over a number of years. To varying degrees, the Government obtained evidence tending to corroborate some of these prior robbery attempts and charged Defendants with the attempts that occurred between May 2010 and October 1, 2010.

In part as a result of Moss's cooperation, the grand jury returned charges against Defendants Terrance Brown, Toriano Johnson, Daryl Davis, Hasam Williams, Joseph K. Simmons, and Bobby Ricky Madison, relating to the October 1, 2010, armored-car robbery and some of the other alleged attempted armored-car robberies about which Moss told the Government during his debriefing sessions. Defendant Madison's trial proceeded separately from the other Defendants.[1]

## B. Bobby Madison's Trial

During Madison's trial, the Government called Moss to testify. During his testimony, Moss implicated Defendants Brown, Johnson, Davis, Williams, and Madison by name, and Defendant

---

[1]Defendant Madison allegedly was not involved in the October 1, 2010, robbery that resulting in the death of the Brink's messenger. As a result, he was not death-penalty eligible like the other Defendants in this case. A few months after the conclusion of Madison's trial, the Government announced that it would not seek the death penalty for the other Defendants in this case.

Simmons by description. He provided exacting testimony explaining each Defendant's alleged role in the robbery and attempted robberies, as well as information regarding the details of the crimes. The Government then presented corroborating evidence, such as video recordings of vehicles during the alleged crimes, which matched Moss's descriptions; cellular telephone records indicating the locations of Defendants' cellular telephones in the areas where Moss described during the periods that Moss alleged; and other similar evidence. In response, Madison attempted to impeach Moss's testimony, alleging that he had fabricated it. On redirect, Moss testified as follows:

> Q: . . . You were asked some questions about whether you had reviewed what's called discovery in this case with your lawyers. Do you remember being asked that?
>
> A: Yes, Sir.
>
> Q: And just to make it clear, the government is under an obligation to provide to the defense all of the evidence that it's going to use against you?
>
> A: Yes, Sir.
>
> Q: And your lawyers told you that we did that?
>
> A: Yes, Sir.
>
> Q: Did you see in that discovery or did they ever talk to you and say, hey, we looked at discovery, what's this about a 2005 event?
>
> A: No.
>
> Q: In fact, when did we find out there was a 2005 event?
>
> A: It's when the question was asked of me has there been any other robberies, and I volunteered that information honestly.
>
> Q: After you pled guilty?

| A: | After I pled guilty. |
|----|----|
| Q: | And when was it that the government found out that you had been involved in a July attempt? |
| A: | After I pled guilty and I told the truth about the situation currently to the same question, has there been any other robberies, particular robberies like that that we have did. |
| Q: | That wasn't in the discovery either? |
| A: | No. |
| Q: | And how about the attempt on 9/17, when did the government find out that there had been an attempt on 9/17? |
| A: | Way after my pleading guilty. |
| Q: | Was there anything that you reviewed that led you to believe that the government knew about the 2005 incident, the Lighthouse Point or the attempt in September? |
| A: | No, Sir. |
| Q: | Was any of that in the discovery? |
| A: | No, Sir. |
| Q: | You told us? |
| A: | Yes, Sir, I did.  I wanted to be truthful about the whole situation.  I mean, that is the best thing, being repentive for what I have done. |

ECF No. 392 at 228:12 - 230:1.  Based on this testimony, during closing, the Government argued that Moss was credible because the Government was unaware of pretty much everything other than the October 1, 2010, robbery until Moss told the Government about the prior attempts and successes.

## C.  The Rule 17 Subpoena Directed to Moss's Counsel

Because of this testimony and argument in the trial of Madison, Defendant Brown sought the

issuance of a Rule 17, Fed. R. Crim. P., subpoena to counsel for Moss, seeking the following:

1. The investigative file related to work performed on behalf of Nathanial Moss (excluding information received from the government in discovery) as it relates to Mr. Moss's involvement with Mr. Brown in automobile thefts, robberies and/or robbery attempts;

2. All notes, memorandum and correspondence containing any facts which touch upon Mr. Moss's involvement with Mr. Brown in automobile thefts, robberies and/or robbery attempts (excluding information received from the government in discovery); and,

3. All correspondence between the government attorneys and/or agents and the defense team, other than discovery responses which were filed in the court record and items identified within those discovery responses, which include information touching upon Mr. Moss's involvement with Mr. Brown in automobile thefts, robberies and/or robbery attempts.

ECF No. 529 at 4.

In its Response to Defendant's Motion for Issuance of Rule 17 Subpoena to Counsel for Nathanial Moss [ECF No. 568], the Government noted that counsel for Defendant Brown had advised the Government that he was seeking from the Government those documents identified in the third request set forth above. ECF No. 568 at 2. The Government further stated that it was "not aware of the existence of any documents fitting [Brown's] request as set forth more particularly in category #3 of his motion. All documents, if any, that defendant Brown may believe fit his request would have been filed as a Response to the Standing Discovery Order in *U.S. v. Moss* . . . ." *Id.*

Counsel for Moss vehemently opposed Brown's Motion, invoking the attorney-client privilege and work-product protection. *See* ECF No. 572. Moss's counsel further argued that Brown had failed to make any showing that he was entitled to the documents that he sought. The Court

agreed and denied Brown's Motion for Issuance of Rule 17 Subpoena to Counsel for Nathanial

Moss.  *See* ECF No. 591.

### *D.  Brown's Trial*

### 1.  Brown's Opening Statement

The trial of Brown, Williams, Johnson, Davis, and Simmons proceeded on May 24, 2013.

*See* ECF No. 742.  During his opening statement, counsel for Brown said,

> [T]he evidence is going to show that Moss believed he had two choices.  Tell the government what it wants to hear or die.  Those were the choices that he was faced with.
>
> Moss was very aware that if he did not name Terrance Brown as being involved in this robbery, that the government would not consider him to be truthful and that he would be executed.  And that he would not have a deal.
>
> * * * * *
>
> Moss was well aware of the government's belief and how it was approached in this case.  In June, eight months after he was arrested, in June, after he had over eight months to think about this and receive evidence from the government, he went in for his first debriefing, talked to Agent Starkey and he told a story.
>
> . . . . [F]or the first debriefing, Mr. Moss went in and told the government that telephones were involved.  He refused to name the individuals involved in the case.  Now mind you, at this time, he was still facing a death penalty prosecution.  He was facing the death penalty.  And he had to know that the government would be willing to give him a deal and waive death.
>
> He refused to identify any of the people involved in the case and only referred to the phones by code.  So what did Agent Starkey or Officer Starkey — of the Doral Police Department, not of the FBI, do at the end of this interview?  Took out a picture of my client, Terrance Brown, and showed it to Moss.
>
> Moss knew exactly who Officer Starkey wanted to hear was involved

in this case. And that wasn't the only evidence that Moss had that the government had turned over to him. They had also turned over, before he ever went in, records of my client's cell phone. The cell phone they claim my client had.

You heard the government mention September 10th, September 17th, September 21st. The government turned over information to Moss that showed Moss that those were dates that he was interested in. They turned over witness statements to Mr. Moss that talked about men being at that scene prior to the October 1st robbery. They fed him this information before he ever went in and told them this story.

ECF No. 861 at 29:1-31:21.

2. Nathanial Moss's Testimony on Direct Examination

Nathanial Moss testified soon after the parties completed their opening statements. During his testimony on direct examination, Moss stated that, before he had his first debriefing session with the Government, he was not aware of whether the Government had provided his attorneys with discovery in the case. Nor, Moss attested, did he know what information the Government had regarding the October 1, 2010, robbery or any prior robberies or robbery attempts in which he had engaged:

> Q:      . . . Prior to the debrief [by the Government], did you view for yourself and interpret for yourself any information related to cell phone data?
>
> A:      Yes.
>
> Q:      Okay. And was that in relation to which phone?
>
> A:      That was in relation to phone one, phone two, phone three.
>
> Q:      Maybe I'm not being clear.
>
> * * * * *
> Q:      Okay. Let me try to speak more plainly.

A:     Okay.

Q:     Are you aware of whether the government was giving your lawyers what's called discovery?

A:     No.

Q:     Okay. Are you aware of whether the government was giving your lawyers evidence in the case against you?

A:     No.

Q:     You have no knowledge of that?

A:     If I do, I can't remember.

Q:     . . . [D]id you, prior to the debrief, where you were talking about telephone one, telephone two, telephone three, did you see any of the videos of the Bank of America IHOP?

A:     No.

Q:     Prior to the debrief where you were talking about telephone one, telephone two, telephone three, were you charged in any robbery other than the one on 10/1?

A:     No.

Q:     Prior to . . . The first debrief, . . . did you view any maps that . . . you were told showed where phones were in relation to the Bank of America or people's houses or anything like that?

* * * * *

A:     No.

Q:     . . . Prior to the first debriefing, did you have any information about how far along the government was in its investigation of the robbery crew?

A:     No.

Q:     Prior to the first interview, had you seen anything that would

-8-

lead you to believe that the government already had certain people in mind in regards to the robbery crew?

* * * * *

A:     Prior to, no.

* * * * *

Q:     . . . Prior to debrief number one, did you have any information that the Government was looking at Terrance Brown as part of this crew?

A:     No, I can't remember.  No.

* * * * *

Q:     At any time after the interview ended, did the government show you a photograph of Terrance Brown?

A:     Yes.

Q:     And when you saw the photograph of Terrance Brown, do you remember how you felt when you saw that photograph?

A:     Yes.

* * * * *

Q:     How did you feel?

A:     Surprised.  I was surprised . . . .  You all really did all your investigation.

* * * * *

Q:     . . . [W]ho was the first person to bring up the attempt in . . . September when Bobby [Madison] panicked, the one that we've been referring to, who was the first person to bring that up with the government, you or somebody else?

A:     Me.

\* \* \* \* \*

Q:     Based upon the information available to you at the time, did you have any information or reason to believe that the government knew about the 9/17 event before you brought it up?

A:     No.

Q:     And how about for July?

A:     No.

Q:     And how about for the February 2005?

A:     No.

\* \* \* \* \*

Q:     At the time that you were given the government information about the participants, and you started to name names and you started to name dates and prior attempts, did you know whether the government had cell phone data that could place people at certain locations?

A:     No, I did not.

Q:     Did you know whether the government had any evidence to support or contradict any of the information you were giving?

A:     No, I did not.

\* \* \* \* \*

ECF No. 771 at 160:21-177:21.

### 3.  Nathanial Moss's Testimony on Cross-examination

On cross-examination, counsel for Defendant Brown obtained several impeaching admissions from Moss:

Q:     Mr. Moss, during [your] sworn change of plea hearing, do you

recall the Court asking your lawyers, "And what steps have you gentlemen taken to familiarize Mr. Moss with those elements and the charges pending against him?" And your attorney Mr. Day responded, "Many steps, Judge. In this particular case, Mr. Matthewman and I have spent an inordinate amount of time with Mr. Moss going over all the discovery. All of the witness interviews that the government has on it, all of the forensic evidence, the forensic reports that were involved in this case, and then, of course, our own investigation that we conducted. All of that has been shared with Mr. Moss. I don't know how many hours are involved in that, but a multitude of them. We have discussed with him the elements of this crime as Mr. Linder has just accurately laid out and discussed with him how the evidence would relate to those and whether the case, whether the government would be able to prove the elements beyond a reasonable doubt. Of course, we discussed our defenses with him. And then the different sentencing oppositions [sic] that the Court has explained to Mr. Moss today. All of that we have gone over in extreme detail." And then the judge asks, "Mr. Moss, is that you understanding as well, Sir?" And you answered, "Yes, Your Honor." Do you recall that?

A:     Yes, I recall answering, "Yes, Your Honor."

* * * * *

Q:     Okay. Who is Arish Small?

A:     My ex-girlfriend, Sir.

Q:     And how many times did she come in and visit you while you were incarcerated before you took this plea?

A:     Numerous times.

Q:     Many, many times?

A:     Numerous, yes, Sir.

* * * * *

Q:     Isn't it true, Sir, . . . that Ms. Small told you because she had

been approached by Agent Starkey and told that Mr. Brown was involved in this case before your change of plea?

\* \* \* \* \*

Q:     You never had that discussion with Ms. Small?

A:     I don't remember that discussion, Sir.[2]

Q:     And you were brought in to the Broward County jail when you were first arrested, correct?

A:     Not when I was first arrested; I was admitted inside the hospital.

Q:     Okay. And when did you get into the jail?

A:     If I'm not mistaken, October 7.

Q:     Okay. And in the hospital, did you have a TV? Did you have any news?

A:     Yes, I did.

Q:     Okay. And isn't it true, Sir, that Mr. Brown's photograph was in the news immediately follow [sic] the October 1st robbery as a person of interest?

A:     Yes.

Q:     So you were aware that the government was interested in Mr. Brown in connection with the October 1st case?

A:     Yes.

*Id.* at 184-:4-186:24. Over the Government's objection, the Court subsequently allowed Brown to

admit into evidence the portion of the change-of-plea transcript that he read during cross-

_____

[2]Simmons later called Officer Starkey as a witness and asked him whether he had interviewed Small and shown her videos and photographs. *See* ECF No. 1003 at 147:19-148:8. Starkey replied that he had interviewed Small in October 2010 (well before Moss pled guilty) and that he had showed Small both videos and still photographs. *Id.*

examination of Moss.  *See* ECF No. 1003 at 12:16-17:21.

During a sidebar in Brown's counsel's cross-examination of Moss, counsel for Johnson

remarked, "Judge, now that the government has had a chance to go into this in direct, I think they've

completely opened the door.  Mr. Moss has waived any attorney/client privilege.  I think now we're

entitled to the investigation that Mr. Day—."  *Id.* at 183:11-:15.  Because the jury was waiting and

the objection came from an attorney who was not examining Moss at the time, the Court directed

counsel for Johnson to raise the issue at a later time so as not to use the jury's time unnecessarily on

a sidebar.  *Id.* at 183:16-:21.

### 4.  The Court's Consideration of the Defense's Request to Call Moss's Counsel

The parties brought up the issue again after the jury was dismissed for a break, and the Court

indicated that it was going to take some time to think about it.  The next day, the following discourse

occurred:

> Court:  Okay.  So, I went back and thought about this more, and it
> occurs to me that there are not three problems.  The first
> problem is the attorney-client privilege.  The second problem
> is the work-product protection — I'm talking about from the
> standpoint of Mr. Moss.  And now a third problem, which is
> if I put Mr. Day [Moss's counsel] on the stand, he could
> arguably testify contrary to the interests of his client, which is
> an ethical problem.  And I don't want to put him in that
> position, so I'm not going to do that.  So that leaves the
> question of how do we address — how do we test what it was
> that Mr. Moss testified to yesterday?  And some of it I think
> is already covered.  I think Mr. Louis [Brown's counsel]
> addressed the issue with respect to whether he saw the
> discovery.  Mr. Moss testified that he didn't.  Mr. Louis
> impeached him with the statements from his change of plea
> hearing where he admitted that he had.  In addition, Mr. Louis
> asked him about Ms. Small, who I imagine Mr. Louis is going

to have testify at a later point in time — no? Okay.[3]

Louis: There is a report by Agent Starkey, I think it's grand jury testimony, where he told her about my client or mentions my client to her.

Court: Okay. Well, in any case it's going to come in at some point. So that's taken care of. So let's address what issues are left that you suggest can't be tested as a result of my not asking for Mr. Day to come in and testify.

\* \* \* \* \*

Court: . . . It is a particular problem to call Mr. Day in this case because, I mean, it would be bad enough if the case were closed, but Mr. Moss's case to a certain extent is still somewhat pending, since we all know that he is hopeful of receiving a Rule 35. So putting Mr. Day up here obviously would be asking Mr. Day possibly to jeopardize his own client's interests . . . .

ECF No. 863 at 3:7-4:19.

Counsel for Brown suggested appointing new counsel for Moss and directing the Government to require Moss to allow his attorney to testify if Moss wanted to receive a reduction in sentence under Rule 35, Fed. R. Crim. P. *See* ECF No. 863 at 5:11-:24. Alternatively, Brown's counsel requested that Moss's testimony be stricken. *See id.* at 5:25-6:6. Finally, Brown's counsel proposed as his "least preferable alternative" to strike the entirety of Moss's testimony "as it relates to what he knew about prior to his debriefing, give an instruction from [sic] the jury to disregard it, prohibit any further testimony on that issue and prohibit the government from arguing that in closing argument." *Id.* at 7:18-8:1.

---

[3]In fact, Small did testify at a later point in the trial, but she was called by Simmons. Brown did not take that opportunity to cross-examine her about what, if anything, she had told Moss when she visited him at the jail before he pled guilty.

The Court then called Moss's counsel to ask whether he would be willing to testify. *See* ECF No. 863 at 68:15-69:3. Moss's attorney refused to answer any questions because of ethical constraints. *See id.*

The Government then indicated its intention to call Officer Starkey as a witness later in the trial and noted that he was knowledgeable about what information the Government had provided to and withheld from Moss's legal team.[4] *Id.* at 72:3-:12.

Returning to the discussion regarding Moss and his attorney, Defendants Brown, Johnson, and Williams moved for a mistrial, and the Court denied the motion.[5] The Court also declined to strike Moss's testimony in its entirety. So Williams's counsel requested that the Court strike the questions and answers regarding what Moss was provided in discovery. *See* ECF No. 863 at 81:8-:13. The Court then asked the attorneys to propose such an instruction. In response, counsel for Johnson and Williams suggested the following:

> You have heard testimony from Nathanial Moss about what evidence he was shown from the government and his attorneys. You are to completely disregard that testimony and not consider it in any way in your deliberations.
>
> The defense has no way of testing Mr. Moss's credibility on this issue because his attorney is refusing to turn over the files pertaining to the

---

[4]Officer Starkey sat at the Government's table throughout trial and later testified extensively and was subject to cross-examination by all Defendants. *See* ECF No. 844 at 30:20-165:17; ECF No. 1003 at 135:17-149:11; ECF No. 968 at 3:2-44:17; ECF No. 1009 at 26:5-165:12.

[5]Defendants Davis and Simmons opposed the motion for mistrial. *See* ECF No. 863 at 79:24-81:3. Counsel for Davis explained, "I'm satisfied to argue my case to this jury on this record, especially because Mr. Day made a statement as counsel for Mr. Moss. He told Judge Cohn what he had done, that he had prepared the case. He went over everything — I don't know if he used the word 'meticulously,' but something to that effect — with Mr. Moss, and I'm satisfied that I'm in a position to argue my case to this jury." *Id.* at 80:5-:12.

Moss investigation. Whether he provided all of the evidence in the
case to Mr. Moss.

*Id.* at 87:9-:17.  The Court declined to give the second paragraph of the requested instruction but did

read the first paragraph.  *See id.* at 96:17-97:18.  Upon instructing the jury, the Court inquired of the

jury to make sure that it understood the instruction.  *See id.*  One juror asked that the instruction

simply be repeated, and the Court did so.  *Id.*  None of the jurors indicated in response to the Court's

question that they could not follow the instruction.  *Id.*

On June 10, 2013, Brown subpoenaed Moss's counsel to testify in Brown's case.  *See* ECF

No. 788-1.  Counsel for Moss filed a motion seeking to quash the subpoena.  *See* ECF No. 788.  In

the motion, counsel for Moss represented that counsel for Brown had advised him that he "intend[ed]

to delve into communications between the defense team and Moss concerning discovery and the

investigation."  *Id.* at 1.  Counsel for Moss objected and invoked the attorney-client privilege and

the work-product protection on Moss's behalf.  *See, generally, id.*  In discussing the motion, the

parties noted that now-Magistrate Judge William Matthewman and Tim Day, Moss's attorneys,

wrote in support of Moss's mitigation package, "[Nathanial Moss's] testimony will not [be] based

on facts provided in discovery, but will clearly be seen to have come from his own personal

knowledge of this crime."  ECF No. 1008 at 412:16-:18.  The Court granted the motion to quash.

*See* ECF No. 813[6]; *see also* ECF No. 1008 at 406:17-413:5.

---

[6]Although the minute entry for June 13, 2013, shows that a hearing on the motion to
quash was conducted that day after trial proceedings, the transcript from June 13, 2013, does not
include the proceedings on the motion to quash.  *See* ECF No. 1029.  Instead, the transcript ends
with the dismissal of the jury and the Court's advising of the parties that it would be taking a
short break for the Court reporter, after which time, hearings on motions would occur.  *See id.* at
299:5-:14.  The Court does not recall whether the Court reporter was present for the motion
hearings at the end of the day, but if not, all proceedings are recorded on the Court's DAR
system, and a transcript of the proceedings may be obtained.

## 5. The Charge Conference

During a portion of the charge conference, Brown requested that the Court give the jury a missing-witness instruction with regard to Moss's counsel. *See* ECF No. 1005 at 18:18-19.9. The Court denied the request. *Id.* at 25:9-26:7. Counsel for Brown then suggested that the Court provide the following instruction:

> It was particularly within the power of the United States to request that Nathanial Moss waive his atotrney-client privilege so that Mr. Moss's attorney, Mr. Day, could be called to the stand and examined by the defendants in this matter regarding the Moss defense investigation. You may consider the failure of the government to make this request in your deliberations.

*Id.* at 26:11-:18. Although the Court declined to give the instruction as phrased, the Court instead decided to provide the following instruction:

> Both the defense and the government were unable to have access to Mr. Moss's attorneys' investigation of this case because of the attorney-client privilege and the attorney work-product protection. These are recognized legal doctrines that protect a client's legal discussions with his attorney and the attorney's private work product developed in furtherance of his client's case. Therefore, it is unknown what, if anything, Mr. Moss had access to.

*Id.* at 28:8-:16. Counsel for Johnson agreed, and no parties voiced any objections to the instruction, *see id.* at 18:17-29:21, so the Court gave the proposed instruction when it read the jury instructions.

## 6. Brown's Closing Argument

During closing arguments, counsel for Brown argued vehemently that the Government's case rose or fell with Moss's testimony. *See* ECF No. 1004 at 58:3-88:23. He further urged the jury to find that Moss had been untruthful — that he had used the eight months between his arrest and his first debriefing with the Government to ascertain what the Government wanted to hear by reviewing

the materials available to him to do so:

> The government's theory of this case is that Moss can be believed beyond a reasonable doubt because of all the testimony that corroborates what he had to say. That's their theory in this case. Anything that is free from taint, anything that Moss didn't have for the eight months that he was sitting there stewing over facing the death penalty is tainted. And it shows—it's not tainted, excuse me, it shows that Moss is being untruthful. And the government says, well, they make a bunch of excuses for him. I'm going to talk about the ones that stand out to me. But let's talk about what is free from taint and what is not.

> The government gave Moss telephone records for the phone that they're trying to attribute to my client which I readily say to you, yes, he could be reached at that number sometimes. . . .

> Agent Magnuson admitted that he prepared mapping solutions and I went up there and crossed him on it. He prepared these in January of 2011. Yep, and they went to Moss. That's six months, five, six months before he testified.

> The government gave Moss one full year's worth of the IHOP surveillance video. The video that Mr. Gilfarb has been showing you repeatedly. One full year's worth of that video to go over before he ever came in and testified.

> They gave Moss the statement of Ms. Plaza, Susana Plaza, who talked about the men jumping into her yard. And she talked about it happening beforehand, too. Moss knows about Bobby Madison's arrest for the stolen car. He knows about Mr. Williams's arrest.

> That is not pristine evidence. That's not evidence that is somehow free from Moss's ability to weave it into a story. . . .

> We know Moss believed that the government was going to execute him for what he did. He had to admit that. Moss is aware at the time of his debrief that he believes that the government believes that Mr. Brown did this. He had to admit that when I was asking about Arish Small and Mr. Brown's picture all over the news.

> He knows that if he doesn't provide a story that the government finds acceptable, that is consistent with what the government believes, that

> he is going to die. That is his belief and that's what I showed you at
> the beginning of the closing argument.
>
> Now Mr. Moss wasn't caught in any lies. I'm about to show you one
> that goes to the heart of what I'm arguing here. This is Mr. Moss's
> willingness to admit to having information or not. This is from
> Moss's testimony."

ECF No. 1004 at 74:19-76:24. At this point of the closing, Brown's counsel read into the record the

Government's questioning of Moss where Moss denied being aware that his defense team had

received discovery, including videos cell-site information and maps, and other materials, and Moss

denied having any knowledge that the Government considered Brown a person of interest in its

investigation. *Id.* at 76:25-79:24.

Brown's counsel then remarked,

> That's what he says. That is a lie. There's a lot of times in trials
> where you can say, oh, the witness might have been mistaken.
> Maybe, you know, he forgot. Maybe his memory wasn't good. But
> that's a lie. You take a look at Defendant's Exhibit 9, which is in
> evidence and you'll have it with you.

*Id.* at 79:25-80:4. Next, Brown's counsel painted a contrast between Moss's trial testimony and his

sworn admission during his change of plea, where Moss acknowledged that his attorneys had spent

a lot of time with him reviewing the discovery and that they had conducted their own investigation.

*Id.* at 80:5-81:3. After reading into the record Moss's attorney's statements regarding what his

attorneys had done to advise Moss in arriving at his change-of-plea decision and Moss's concession

that they had, in fact, done the things that his attorney said, Brown's counsel urged,

> That's not some insignificant half truth. That is a lie that goes to the
> heart of what the government is talking about and what I've been
> talking to you about since opening statements. Is Moss's access to
> information. Now again, I want to be clear. Am I suggesting that Mr.
> Day or Mr. Matthewman, his lawyers were sitting down with mr.

> Moss or the prosecutors were getting together with those lawyers and saying, "This is what we need Moss to say"? I am absolutely not saying that. That is not what I'm telling you. But I am telling you is that this is a man who doesn't hesitate to kill another human being when he feels threatened, who believes he's facing the death penalty and knows that Agent Starkey and the government believes that my client was involved. What else is he going to say?

*Id.* at 81:4-:17.

<u>7. The Verdict</u>

On July 15, 2013, the jury returned its verdict as to Brown. *See* ECF No. 887. The jury found Brown guilty as to Count 1 of the Superseding Indictment, the count charging conspiracy to commit Hobbs Act robbery. *See id.* As for all of the other charges, the jury could not reach a verdict, and the Government subsequently declared its intention to retry Brown on Counts 2 through 8. *See id.*; ECF No. 919.

<u>8. The Pending Motion for New Trial</u>

Following these events, Brown filed the pending Motion for New Trial [ECF No. 1057]. In his Motion, Brown asserts that he should receive a new trial "because of the infringements upon his ability to effectively cross-examine the government's main witness, Nathanial Moss, and his ability to compel the production of witnesses and evidence which would have been used to undermine the testimony of Nathanial Moss." *Id.* at 1. In particular, Brown complains that his right to compulsory process was violated when the Court quashed the subpoena to Moss's counsel and that his Confrontation Clause rights were violated when the Court declined to allow Brown to elicit from Moss information protected by the attorney-client privilege and the work-product protection. *See id.*

## *II. Discussion*

Rule 33(a), Fed. R. Crim. P., allows a court to "vacate and judgment and grant a new trial if the interest of justice so requires."[7]  Under this rule, the decision whether to grant a new trial rests within the sound discretion of the district court.  *United States v. Vicaria*, 12 F.3d 195, 198 (11th Cir. 1994) (citation omitted).

### *A. The Compulsory-process Claim*

Among other guarantees, the Sixth Amendment to the United States Constitution promises that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor . . . ."  U.S. Const. amend. VI.  Here, Brown complains that the Court's quashing of the subpoena to Moss's attorney after Moss's attorney invoked Moss's attorney-client privilege and work-product protection violated Brown's Sixth Amendment right to compulsory process.  This Court need not reach that determination because even if it did, Brown was not prejudiced.

In *United States v. Buckley*, 586 F.2d 498 (5th Cir. 1978),[8] the Eleventh Circuit's predecessor court considered a claim similar to Brown's.  In that case, Buckley, an attorney, was charged with eight tax-related crimes.  During the prosecution's case, the government presented the witness Richard Castle.  586 F.2d at 502.  Castle recounted several affirmative acts of tax evasion in which

---

[7]Because of the length of the trial, the number of Defendants, and the complexity of some of the issues that arose during the trial, within fourteen days of the verdict, the Court exercised its authority to extend the time within which Defendants could file motions for new trial until after all transcripts had been prepared.  *See* Advisory Committee Notes to 2005 Amendments to Fed. R. Crim. P. 33.

[8]Under *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

Buckley had engaged.  *Id.*  Buckley had represented Castle in prior litigation, but the two had not been able to agree on the payment of fees, so Buckley had brought an action against Castle to recover his fees.  *Id.*  To impeach Castle's credibility, Buckley tried to call the three attorneys who represented Castle in a the civil action that Buckley brought to collect attorney's fees from Castle. *Id.*  As Buckley explained the reason for calling these attorneys, Buckley intended to show that Castle was biased against him as a result of the fee dispute.  *Id.*  In addition, Buckley proffered, he desired to prove that Castle had lied to his attorneys about the settlement offer that he had originally received in the prior litigation before Buckley represented him.  *Id.*  Castle invoked the attorney-client privilege, however, so none of the three attorneys testified.

On appeal, Buckley alleged that his Sixth Amendment right to compulsory process had been violated by the turn of events.  *Id.* at 503.  The former Fifth Circuit first recognized the "pragmatic considerations underlying the implementation of the policy behind the attorney-client privilege, which is to encourage the free-flowing communication and candid disclosure so vitally necessary to effective representation by counsel.  This policy cannot be achieved unless a client is free to communicate with his attorney 'without fear of consequences or the apprehension of disclosure.'" *Id*. at 502 (citations omitted).  Then the court acknowledged that a defendant's Sixth Amendment rights may, in some circumstances, trump claims of privilege.  *Id.* at 503.  But the court concluded that it need not sort out how the right to compulsory process and the attorney-client privilege matched up in *Buckley* because even if Buckley's rights had been infringed, Buckley had suffered no prejudice.  *Id.*  In explaining why this was, the court noted that Buckley was able to place before the jury evidence of the same facts that he sought to elicit through the presentation of Castle's attorneys.  *Id.*  Thus, the court determined that it was "obvious that Buckley was in no way

prejudiced by the invocation of the privilege." *Id.*

This case is no different. Here, Brown sought to present the testimony of Tim Day, Moss's counsel, to impeach Moss's contention that he had not been shown discovery by his attorneys. When Moss invoked the attorney-client privilege and the work-product protection through Day, Brown was able to prove precisely the same point by reading a portion of the transcript from Moss's change-of-plea hearing in which Moss admitted that his attorneys had thoroughly reviewed all discovery with him and that they had conducted an investigation into his case. Even if Day had testified, the evidence on this point could not have been more favorable for Brown.[9] Indeed, contrary to the usual evidentiary requirements, the Court even permitted the relevant portion of the transcript to be entered into evidence and sent back to the jury room during deliberations. Had Day testified to this same point, no transcript would have been admitted. And Brown's counsel was very capably able to use the transcript to great advantage in his closing, relying on it to argue that Moss had affirmatively lied — not just erred, but lied — to the jury about Brown's involvement in the robberies. In short, Brown cannot demonstrate any prejudice resulting from the Court's decision to quash the subpoena to Day.[10] As a result, no new trial on this basis is warranted.

---

[9]In fact, based on Moss's attorneys' statement in Moss's mitigation package that "[Nathanial Moss's] testimony will not [be] based on facts provided in discovery, but will clearly be seen to have come from his own personal knowledge of this crime[,]" ECF No. 1008 at 412:16-:18, no reason exists to believe that Day's testimony regarding what Moss knew and when he knew it would have been at all favorable or helpful to Brown. Instead, it appears that, had the Court compelled Day's testimony, it would have helped the Government by bolstering Moss's credibility.

[10]Brown does not argue that the verdict on Count 1 was contrary to the manifest weight of the evidence, so the Court does not review here the evidence supporting the verdict. Nevertheless, the Court notes that it does not find the verdict on Count 1 to be contrary to the manifest weight of the evidence.

*B.  The Confrontation Clause Claim*

The Sixth Amendment also guarantees all criminal defendants the right "to be confronted with the witnesses against him . . . ."  U.S. Const. amend. VI.  Brown complains that his Confrontation Clause rights were violated when the Court did not allow counsel to inquire of Moss into areas protected by the attorney-client privilege and the work-product protection.  This Court respectfully disagrees.

It is true that "[c]ross-examination of a government 'star' witness is important, and a presumption favors free cross-examination on possible bias, motive, ability to perceive and remember, and general character for truthfulness."  *United States v. Maxwell*, 579 F.3d 1282, 1295-96 (11th Cir. 2009) (citation and internal quotation marks omitted).  But a defendant's right to cross examine a witness — even a star witness — is not boundless.  As the Eleventh Circuit has explained, "[T]he defendant 'is entitled only to an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defendant might wish.'"  *Id.* at 1296 (citations omitted).  Thus, a defendant's Confrontation Clause rights are not violated when two circumstances are satisfied: (1) through the cross-examination that is allowed, the jury learns of sufficient facts to allow it to "draw inferences relating to the reliability of that witness," and (2) the permitted cross-examination enables defense counsel "to make a record from which he could argue why the witness might have been biased."  *Id.* (quoting *United States v. Van Dorn*, 925 F.2d 1331, 1335 (11th Cir. 1991)) (quotation marks omitted).  Ultimately, "[t]he test for the Confrontation Clause is whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination."  *Id.* (citation and internal quotation marks omitted).

-24-

Here, the Court did not permit counsel to inquire of Moss about matters protected by the attorney-client privilege and the work-product protection.  In particular, Brown's counsel desired to cross-examine Moss regarding what his attorneys had showed him and told him, in an attempt to establish that Moss had fabricated his testimony when he implicated Brown in the robberies and had pieced together his statements about Brown based on information that he had learned through discovery and his attorneys' investigation.

But Moss was sufficiently cross-examined to obtain the evidence necessary to make exactly these points without breaching the attorney-client privilege and the work-product protection.  In particular, Brown's counsel was able to impeach Moss's claim that he was not aware of materials produced in discovery by obtaining Moss's admission that he had made the opposite statement under oath to a different judge in Moss's change-of-plea hearing.  More specifically, Moss conceded that he had previously agreed under oath with his attorneys' representations to Judge Cohn that Moss and his attorneys had spent "an inordinate amount of time" reviewing discovery.  In addition, the parties presented evidence regarding what the Government had turned over to Moss's defense team in discovery, so Brown's counsel was able to argue — and did argue in closing — that Moss had access to specific records, such as cell-site location data for Brown's telephone, video recordings of the robberies and robbery attempts, witness statements, and other materials, before he ever implicated Brown in the charged crimes.

And Brown's counsel and the other defense attorneys impeached Moss's testimony and his credibility in numerous other ways as well.  For example, Brown's counsel impeached Moss's claim that he was not aware that the Government viewed Brown as a person of interest before Moss identified Brown as one of his co-conspirators.  In this regard, Brown's counsel was able to obtain

Moss's admission that he had seen Brown's photograph on television shortly after the robberies and that television reports indicated that authorities were looking for Brown to speak with him. Similarly, Brown's counsel made Moss admit that he had seen his ex-girlfriend Arish Small numerous times between his arrest and his debriefing, and evidence presented later in the case revealed that Small had been interviewed by law-enforcement authorities immediately after the October 1, 2010, robbery, and that they had spoken to her about Brown. Other defense attorneys questioned Moss about his prior convictions and described him as a "cold-blooded killer." They further pointed out inconsistencies in his testimony.

In addition, Brown's counsel and other defense attorneys hammered Moss's plea agreement with the Government, with Brown's counsel asserting that Moss had to "[t]ell the Government what it wants to hear or die." And Moss admitted that he did not want to die, that he did not want to spend the rest of his life in jail, and that he hoped that his testimony against Brown and the others would result in a sentence reduction. The record reflects that counsel was able to sufficiently cross-examine Moss to allow the jury to "draw inferences relating to [Moss's] reliability." *See Maxwell*, 579 F.3d at 1296 (citation and quotation marks omitted). Nor would "a reasonable jury . . . have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." *See id.* (citation and internal quotation marks omitted). Under these circumstances, Brown's Confrontation Clause rights were not violated when the Court declined to allow cross-examination into privileged areas. *See Mills v. Singletary*, 161 F.3d 1273, 1288-89 (11th Cir. 1998) (defendant's Confrontation Clause rights were not violated and the district court did not abuse its discretion in limiting cross-examination of the co-defendant to matters that the attorney-client privilege did not protect where permitted cross-examination sufficiently allowed the jury to

judge the co-defendant's credibility). Accordingly, this claim does not provide a basis for granting a new trial.

### III. Conclusion

For the foregoing reasons, Defendant Terrance Brown's Motion for New Trial [ECF No. 1057] is **DENIED**.

**DONE AND ORDERED** at Fort Lauderdale, Florida, this 3rd day of April 2014.

_____
ROBIN S. ROSENBAUM
UNITED STATES DISTRICT JUDGE

copies:

The Honorable Lurana S. Snow

Counsel of Record